**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. WHALLEY, SR.** | : | **Civil No. 4:18-CV-1295** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **C.O. BLAZICK, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This consent case, which comes before us for consideration of a partial motion for summary judgment filed by five individual Defendants, illustrates the utility of such motions. At its core, this case involves excessive force claims arising out of an affray between the plaintiff, Michael J. Whalley, and correctional staff. All parties agree that this Eighth Amendment claim presents factual disputes for trial. Whalley's complaint, however, also advances claims under the First, Fourth, and Fourteenth Amendments. While we are presented with starkly contrasting factual narratives from the plaintiff and the SCI Waymart staff who came into contact with the plaintiff regarding the nature of a physical confrontation which took place on August 14, 2016, the parties agree on some basic facts which facilitate the dismissal of some of the plaintiff's claims. Indeed, it is undisputed that the plaintiff suffered some level

of injury, presently unknown to this court, as a result of this confrontation. On the basis of these injuries, the plaintiff filed a complaint in which he set forth claims under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, the Pennsylvania Constitution, and claims for assault, battery, false imprisonment, and conspiracy under Pennsylvania law. (Doc. 1).

While we agree that Whalley's Eighth Amendment excessive force claim presents disputed issues of fact for trial, we find that the contrasting narratives in the record do not prevent us from awarding partial summary judgment to the defendants on the plaintiff's civil conspiracy claims and claims under the First, Fourth, and Fourteenth Amendments.

## II.    <u>Statement of Facts and of the Case</u>

The facts of this case giving rise to this complaint arose from an encounter between correctional staff at SCI Waymart and the plaintiff which quickly escalated into physical confrontation which led to injuries for the plaintiff. Specifically, at the time this incident took place, the plaintiff, Michael Whalley, Sr., was an inmate incarcerated at SCI Waymart in Wayne County Pennsylvania. On August 14, 2016, the plaintiff and Sergeant Kranick were the only two individuals in the day room at this facility. (Whalley Dep. at 32). The plaintiff had drafted a letter that he later decided he did not want to send, so he approached Kranick and asked if Kranick

could remove the letter from the mailbox. (Id., at 33). Kranick replied that he did not have a key to the mailbox and therefore could not remove the letter for the plaintiff; Whalley would need to wait until another officer came on duty later that day. (Id.) It appears as though the plaintiff was dissatisfied with this response since he believed that all sergeants had a key to the mailbox. (Id.) Kranick, noticing that the plaintiff had expressed this dissatisfaction in some way, asked if the plaintiff thought he was lying. (Id.) The plaintiff responded that he did believe Kranick was lying. (Id.)

This verbal exchange escalated the confrontation between Whalley and staff. It is undisputed that after this exchange, the plaintiff was taken to the Designated Quiet Area ("DQA"), a closed room where inmates are taken to calm down, by Kranick and Correctional Officers Marvin and Blazick. (Id., at 35; Doc. 32, ¶ 7). Correctional staff then left the plaintiff in the room by himself for a period of time. (Whalley Dep. at 36). It is further undisputed that there is no video recording of the events which transpired in this room since there were no surveillance cameras installed in this area at that time. The officers returned to the DQA a short time later either of their own volition or in response to the plaintiff screaming. (Id.; Doc. 32-6 at 7). What transpired next is hotly disputed.

For his part, the plaintiff claims that the officers returned and began violently assaulting him by cursing, kicking, punching, and stomping on the plaintiff while he laid on the mattress in the room without resisting or fighting back as the officers

conducted their assault. (Whalley Dep. at 37-54). At one point, the plaintiff claims that one of the officers was instructed to get a towel that was then wrapped around the plaintiff's face and used to pull him up from the ground to a standing position by his face. (Id., at 42, 45-47). He was then handcuffed behind his back and the towel was used to swing the plaintiff's head against a wall, causing him to black out. (Id., at 45-48). From there, the plaintiff claims that he awoke to the officers continuing to punch, kick, and stomp on him. (Id., at 48). The defendants dispute this account of this physical altercation.

The officers then attempted to transport the plaintiff to another restraint area upstairs, the H2B, but he was unable to walk on his own. (Id., at 56). Other officers, Tolencio, Smith, and Nenish were then called for backup and to bring an emergency gurney. (Id., at 56-57). The plaintiff was placed in a Reeves Sleeve[1] for transport upstairs. (Id., at 56-57). While completely restrained and immobilized in the Reeves Sleeve, the plaintiff claims that all responding correctional officers were instructed by Kranick to raise the plaintiff above their heads and then drop him to the ground where the back of his head smashed against the floor. (Id., at 60). The officers allegedly conducted this exercise a total of three times before finally placing the

---

[1] A Reeves Sleeve is a restraint device in which the individual is almost completely immobilized. These devices are commonly used to transport patients in the medical field suspected of having a broken back or neck to prevent them from moving and causing more damage.

plaintiff, still apparently conscious, onto the emergency gurney to take him upstairs to the H2B, a restraint room. (Id., at 60-61). Upon arrival in the H2B, the plaintiff's handcuffs were removed, and he was placed in four-point restraints on a bed where he was kept until the next evening. (Id., at 63-64, 66).

The plaintiff alleges that he requested medical attention, but that he was denied medical treatment aside from a short video conference with an individual from the mental health department during his confinement in the H2B to whom he was able to report what had happened. (Id., at 64). According to the plaintiff, it was only after he was released from the H2B that he was able to see medical personnel for an evaluation. (Id., at 68). Thereafter, the medical department took pictures of the plaintiff's alleged injuries, and he was released back to his unit. (Id., at 72).

The responding correctional officers present a vastly different account of these events. Kranick claims that after placing the plaintiff in the DQA, he returned to his post in the day area, but that a few minutes later, he returned to the DQA to respond to the plaintiff's screams and encountered the plaintiff in a fighting stance, threatening Kranick and wanting to fight. (Doc. 32-6, at 7). From there, Kranick called out an emergency code to gather other officers for backup and physically restrained the plaintiff with the help of Marvin and Blazick before handcuffing the plaintiff behind his back. (Id.) The plaintiff continued to struggle and fight the officers' commands, so with the help of additional correctional officers Smith and

Tolencio, the plaintiff was placed in a Reeves Sleeve to control his movements. (Id.) From there, the plaintiff was transported via gurney to the H2B and secured with four-point restraints to a bed in the room. (Id.) The officers' reports and written statements indicate that at no point did they strike, kick, or drop the plaintiff during this encounter. (Id., at 8-13). This incident forms the basis for Whalley's complaint, and constitutes the factual grounds for Whalley's pivotal legal claim, an Eighth Amendment excessive force claim. However, Whalley has also alleged that the investigation into this incident was so deficient that it violated his rights under the First and Fourteenth Amendments, and alleges that the defendants have conspired to violate his First Amendment and due process rights. In addition, Whalley's complaint advances a Fourth Amendment claim, albeit a claim which Whalley now abandons in his response to this motion for partial summary judgment.

On the basis of these strikingly different factual narratives, Defendants Blazick, Kranick, Marvin, Smith, and Tolencio assert that they are entitled to summary judgment on the plaintiff's claims under the First, Fourth, and Fourteenth Amendments in Count I and his civil conspiracy claims in Count IV. (Docs. 31, 33). These defendants have not moved for summary judgment as to the plaintiff's Eighth Amendment claims, however—a prudent choice given the stark factual disputes underlying this claim. For his part, the plaintiff has apparently agreed to the dismissal of his Fourth Amendment claim from Count I, so we do not discuss this

below, but will grant the defendants' motion for summary judgment as to this claim, pursuant to the agreement of the parties. (Doc. 34). While Whalley otherwise insists that his remaining First and Fourteenth Amendment claims should survive, after review, for the reasons set forth below, we will direct that partial summary judgment also be granted as to the plaintiff's claims for civil conspiracy and those arising under the First and Fourteenth Amendments.

## III.  Discussion

### A.  Summary Judgment – Standard of Review

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if

there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence, or assess credibility, when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most

favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

<u>Id.</u> In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 476 (3d Cir. 2011).

**B.** **Partial Summary Judgment is Appropriate as to Whalley's Claims for Civil Conspiracy and Claims Arising Under the First and Fourteenth Amendments.**

The defendants have moved for partial summary judgment on the plaintiff's claims for civil conspiracy, and his claims under the First and Fourteenth Amendments, asserting that there is no record factual support for these claims and that they are accordingly entitled to judgment as a matter of law. (Doc. 33). We note that the face of the plaintiff's complaint is both vague and ambiguous as to the nature of these particular claims, merely stating that he is entitled to recovery under these Amendments without providing any factual allegations in support thereof. We therefore rely on his brief in opposition to summary judgment to clarify these claims. In this brief, the plaintiff states that his claims for civil conspiracy are tied to the Defendants' alleged violations of § 1983 and his First and Fourteenth Amendment rights. In particular, the plaintiff asserts that the defendants engaged in a "conspiracy of silence," recently recognized by the Third Circuit in Jutrowski v. Township of Riverdale, 904 F.3d 280 (3d Cir, 2018), by participating in a sham investigation not designed to investigate anything that happened to the plaintiff, thus denying him his constitutional rights under the First and Fourteenth Amendments. These rights include the plaintiff's access to the courts and his ability to present his case since there are no records of investigation available for his use in this case. We find Jutrowski inapposite to the claims asserted here and further find the plaintiff's

"conspiracy of silence" claims under § 1983, and the First and Fourteenth Amendments without merit.

Jutrowski is not applicable to the plaintiff's case for a number of reasons.[2] Jutrowski involved a highly unusual and striking set of facts where a conspiracy of silence by police was alleged to have wholly stymied efforts to bring constitutional tort claims. Initially, we find that the facts of this case are distinguishable from those in Jutrowski. In Jutrowski, the plaintiff was driving under the influence and had crashed his car along the shoulder of a highway. Id., at 285. State troopers arrived on scene and immediately determined that Jutrowski was heavily intoxicated and in need of medical attention. Id. After convincing Jutrowski to exit his vehicle, the troopers began escorting him toward an ambulance on the other side of the highway. Id., at 286. When Jutrowski became unstable, one of the officers reached for his wrist to steady him, but Jutrowski "pulled his hand away in an upward fashion, subsequently striking [one of the troopers] in the forehead with his forearm[.]" Id. (internal quotation marks omitted). The trooper, in response, executed a "front leg sweep," causing Jutrowski to "face-plant[]" onto the pavement. Id. The troopers then attempted to handcuff him, and "[a]t some point in the midst of this scuffle, one of the officers kicked Jutrowski hard on the right side of his face, hard enough to inflict

_____

[2] Since the plaintiff's brief relies heavily on Jutrowski, we discuss this case at length below.

a 'blow-out fracture,' that is, a broken nose and eye socket, requiring surgery." Id.

Jutrowski was unable to identify which of the officers had kicked him due to his

prone position on the pavement and his intoxicated state. Id.

In the subsequent investigation and lawsuit, none of the four officers involved

in handcuffing Jutrowski denied that his injuries had been inflicted, but they all

asserted that none of them had caused the injury, and none of them admitted to seeing

any of the other officers kick Jutrowski, despite the fact that at least two of the

officers claimed that their sole focus was on Jutrowski's head, and that "if anything

. . . struck [him] in the face, [the officer] would know." Id., at 287 (internal quotation

marks omitted). None of the officers' dash cameras were able to record these events

since they either were inexplicably not recording at the time, or they were not

positioned to capture the events. Id. In addition, Jutrowski was able to proffer

evidence that: there were inconsistencies between the officers' reports after the

incident and their later depositions;[3] the officers had the opportunity to discuss the

---

[3] These inconsistencies included:

> Roemmele's report, the lone Riverdale Police report as none was
> produced by Biro, makes reference to the presence of State Troopers,
> but it does not mention the presence of Biro, who not only participated
> in the arrest but was also Roemmele's supervisor. Heimbach's report
> omits any reference to the use of excessive force, although he does not
> dispute that someone kicked Jutrowski and that his "sole focus" for "the
> entire time" was on Jutrowski's head, so that "if any[one] . . . struck
> [Jutrowski] in the face, [he] would [have] know[n]." For his part,
> Trooper Franchino testified that he was the officer "closest to

sequence of events during the incident prior to drafting their reports and the case itself, and that the officers had so discussed; the only dash cam that would have captured these events was allegedly, inexplicably not recording; and the officers' reports contradicted the medical expert in the case, who stated that his injuries were consistent with "either a kick or a punch of significant force[,]" despite all officers denying that such contact had been made. Id., at 296-98 (internal quotation marks omitted).

In contrast to Jutrowski, where there was ample evidence that the officers involved had fabricated, altered, or colluded to match their stories as time went on, here, we are presented with no evidence that this occurred. In this case, the officers provided their own written and oral statements independently with no evidence that they had discussed the incident, conspired to fabricate or conceal details about the incident, or in any way altered what might have transpired on August 14, 2016. Instead, it appears that the plaintiff himself may have submitted false accounts

---

[Jutrowski's] head," and was "less than three feet" away when Jutrowski was taken to the ground, but professed that he did not ever "look[] at [Jutrowski's] face," and that he checked the box for "moderate injury" on his use of force report only because "possib[ly] someone told" him to do it. The Riverdale officers, who were also in Jutrowski's immediate vicinity, likewise do not contest that a kick occurred, but Roemmele made no reference to it in the one report produced by the Riverdale Police Department, and both officers contend that they did not see it.

Jutrowski, 904 F.3d at 297.

relating to this incident. Specifically, there is evidence on the record that a number of complaints in the internal investigation were filed by Whalley on behalf of his fellow inmates—alleged eyewitnesses to the incident. (Quinn Dep. at 12, 44, 48). There is also evidence that after these inmates were contacted by an investigator for questioning relating to what they supposedly saw on August 14, these inmates withdrew their complaints, some of whom stating that Whalley had filed the complaint on their behalf. (Id., at 44, 48; Hecker Dep. at 16-17). Thus, it appears that there is no record evidence that the officers involved conspired to conceal what transpired on August 14, 2016—only evidence that Whalley was dissatisfied with the outcome of the investigation. Therefore, Jutrowski is inapposite to this case and we decline to apply it here.

In addition, we find that the narrow holding in Jutrowski is inapplicable to this case. Jutrowski held that a plaintiff who is "unable to identify their attacker[] through no fault of their own," but "adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, . . . may be able to state a claim under § 1983 for the violation of a different constitutional right: the due process right of access to the courts." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 285 (3d Cir. 2018). As we have already established, Whalley's case is fundamentally different from Jutrowski. Whalley has not claimed that he was unable to identify his attackers. Quite the contrary, he has consistently maintained his

identification of each officer allegedly involved in this assault from his personal perception of the events as they took place. Indeed, he has alleged specific facts that detail individual officers' step-by-step involvement with this alleged assault from its onset. There simply is no basis for a finding that a conspiracy of silence has now totally impeded Whalley's ability to bring a case.

Further, Whalley has failed to allege that these officers engaged in an after-the-fact conspiracy to cover up their alleged misconduct. The most he has been able to demonstrate is that these officers participated in internal and external investigations conducted by both Waymart and the Pennsylvania State Police ("PSP"), neither of which ultimately revealed the scope or extent of the injuries consistent with the plaintiff's allegations. Not only did the officers fully and independently participate in these investigations, they all separately drafted distinct incident reports before these investigations even took place which contain the same basic chain of events consistent with Whalley's description in terms of his movement throughout SCI Waymart on August 14, 2016. There is nothing in the record to indicate that these reports or investigation interviews were staged, pre-coordinated, or fabricated *post hoc*, and we cannot allow Whalley's speculation in this regard to substitute for evidence. Thus, the plaintiff's assertion that there are no records of investigation available for his use in this case fails. The mere fact that the plaintiff does not like the records or outcomes of the investigation that are available to him

does not mean that the officers responsible for these records engaged in a conspiracy to hide pertinent facts from revelation.[4]

Finding the plaintiff's "conspiracy of silence" argument unavailing, we move to a discussion of what we perceive to be the plaintiff's final avenue to state a claim for civil conspiracy: whether the officers conspired *before* August 14, 2016 to engage in the abuse alleged in the plaintiff's complaint. Since the plaintiff's complaint does not specify whether he brings this conspiracy claim under state or federal law, we analyze this claim under both. However, quite simply, we find that there is no record evidence to support this claim under either body of law.

Pennsylvania law requires "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage" to state a claim for civil conspiracy. McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660 (Pa. Super. 2000) (citing McGuire v. Shubert, 722 A.2d 1087, 1092 (Pa. Super. 1998)). "Proof of malice is an essential part of a cause of action for conspiracy." Goldstein v. Phillip Morris, Inc.,

---

[4] Moreover, we note that we are not presented with deposition testimony from any of these officers. Whalley had the opportunity to depose these individuals and attempt to create his own record, independent of the investigation conducted by SCI Waymart, but it appears that he has not done so, or at least has not provided us with copies. Therefore, he may not argue that the existing record created by SCI Waymart is deficient for purposes of his lawsuit. It is the plaintiff's responsibility to prove his case—not that of the prison system.

854 A.2d 585, 590 (Pa. Super. 2004) (citing <u>Burnside v. Abbott Laboratories</u>, 505 A.2d 973, 980 (Pa. Super. 1985)). Moreover, "[t]he mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." <u>Id.</u>

The standards to state a conspiracy claim under § 1983 are similar to those under Pennsylvania law. "To prevail on a § 1983 conspiracy claim, Plaintiff must allege that Defendants, acting under color of state law, conspired to deprive her of a federally protected right. To succeed on this claim, Plaintiff must allege both an underlying civil rights violation and a conspiracy involving state action." <u>Sershen v. Cholish</u>, 2007 U.S. Dist. LEXIS 79627, *49-50 (M.D. Pa. 2007) (citing <u>Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 254 (3d. Cir. 1999)).

In addition:

> [T]o maintain a civil conspiracy claim, "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." <u>Flanagan v. Shively</u>, 783 F. Supp. 922, 928 (M.D. Pa. 1992). The plaintiff's allegations "must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives." <u>Id.</u> A plaintiff cannot rely on subjective suspicions and unsupported speculation. <u>Young v. Kann</u>, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991). Moreover, "to successfully counter a motion for summary judgment, a plaintiff must provide specific evidence establishing that defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose." <u>Payne v. Gordon</u>, 3:17-cv-1230, 2018 U.S. Dist. LEXIS 129427, 2018 WL 3649026, at *11 (M.D. Pa. Aug. 1, 2018).

Abreu v. Ferguson, 2020 U.S. Dist. LEXIS 45714, *21-22 (M.D. Pa. 2020). Thus, the standards to maintain a conspiracy claim under state or federal law are exacting.

Whalley cannot meet either of these exacting standards required to set forth a successful civil conspiracy claim. The record before us is completely devoid of any evidence that these officers conspired among themselves to engage in the alleged assault on Whalley on August 14, 2016. Quite the contrary, the record supports the inference that these officers were reacting to a sudden affray, rather than conducting any coordinated, pre-planned effort to cause the plaintiff harm. Moreover, many of these officers denied having any personal knowledge of or contact with Whalley before August 14, 2016. Given these undisputed facts, we find the notion that five officers who did not personally know Whalley would conspire to coordinate the alleged assault described by the plaintiff to be wholly speculative and factually unsupported. In addition, we reiterate that "to successfully counter a motion for summary judgment, a plaintiff must provide specific evidence establishing that defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose." Abreu v. Ferguson, 2020 U.S. Dist. LEXIS 45714, *21-22 (M.D. Pa. 2020) (quoting Payne v. Gordon, 3:17-cv-1230, 2018 WL 3649026, at *11 (M.D. Pa. Aug. 1, 2018)). In the absence of such evidence, this claim necessarily fails.

Thus, the plaintiff has failed to set forth claims for either a "conspiracy of silence" or civil conspiracy under state and federal law. Summary judgment is

therefore appropriate as to the plaintiff's claims under the First, Fourth, and Fourteenth Amendments, and the plaintiff's claims for civil conspiracy and the defendants' motion for partial summary judgment, (Doc. 31), will be GRANTED.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. WHALLEY, SR.** | : | **Civil No. 4:18-CV-1295** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **C.O. BLAZICK, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

In accordance with the accompanying Memorandum Opinion, the defendants'

partial motion for summary judgment (Doc. 31) is GRANTED.

So ordered this 23d day of March 2020.

> *S/Martin C. Carlson*
> Martin C. Carlson
> United States Magistrate Judge